UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA    :    Hon. Joseph H. Rodriguez

v.                          :    Criminal No. 15-370

ANGEL ANGULO                :    OPINION

This matter is before the Court on a motion by Defendant Angel Angulo to suppress evidence recovered from a rental car in which he was a passenger on May 14, 2011. The Court has considered the submissions of Defendant and the Government, and heard oral argument on the motion. For the reasons discussed on the record that day as well as those set forth below, the Court denies the motion to suppress.

Procedural History

On May 14, 2011 Angel Angulo, along with co-defendant Crystal Banuelos, was arrested by the Cinnaminson Township Police. Initially, Angulo was charged by the state of New Jersey with Trafficking in Personal (ID) Information (New Jersey Criminal Code 2C:21-17.3(b)); Criminal Attempt (2C-5-1A(1)[2C:21-6D]); and Credit Card Theft (2C:21-6D). Angulo was released on bail. Subsequently, the state charges were dismissed and he was charged in federal court by indictment filed on July 22, 2015. Angulo is charged with one count of conspiracy to commit bank fraud (18 U.S.C. §

1

1349) and one count of aggravated identify theft (18 U.S.C. § 1028A(a)(1)). He was arrested in California pursuant to an arrest warrant issued at the time the case was indicted. At the initial appearance in California, bail was denied. As a result, Angulo was held and transported to the District of New Jersey. He made his initial appearance and was arraigned on August 12, 2015. During hearing, Angulo entered a not guilty plea and consented to detention. He later petitioned the court for bail which was set at $100,000 unsecured bond, co-signed by two individuals, one of which is a third party custodian. On December 16, 2015, all bail conditions were met and Angulo was released from custody. He remains released on bond.

## Factual Background

On May 14, 2011, at approximately 11:45 a.m., Officer F.D. Rock of the Cinnaminson Township Police Department observed a white Chevy Impala with New York license plates ("the Vehicle") parked just under a stop sign at an intersection on Highland Avenue, with Banuelos sitting behind the wheel. (*See* Rock Rpt. at 1.)[1] Rock noted that the car did not move, even though there was a break in traffic. (*Id.*) Rock's suspicions were heightened because knew that the Beneficial Bank, located approximately 220 feet

---

[1] The parked Vehicle was determined to be in violation of N.J. Stat. Ann. § 39:4-138h (improper parking within 50 feet of a "Stop" sign). (*See* Johnson Rpt. at 1.)

away from the Vehicle, had been robbed previously and in those prior robberies, the perpetrators had parked in the same location as the Vehicle, just out of sight of the bank. (*Id.*) Further, Rock noted that several residential day-time burglaries had recently occurred in the area. (*Id.* at 2.) Finally, as Rock drove past the Vehicle, Banuelos avoided eye contact with him. (*Id.*)

As Rock drove closer to the bank, he observed a Hispanic man, later identified as Angulo, walking quickly away from the bank entrance across the parking lot. (*Id.*) Although it was a cloudy day, Angulo was wearing dark sunglasses; also, Angulo was carrying something in his hands, although Rock could not see what it was. (*Id.*) As Angulo saw Rock driving by, he immediately put his head down to avoid eye contact and continued walking at a fast pace toward the area where the Vehicle was parked. (*Id.*) Rock next saw the Vehicle driving toward him with Angulo in the passenger seat. (*Id.*) By this time, Rock had information that the Vehicle was registered to a rental company. (*Id.*)

Rock radioed other officers in the vicinity to look out for the Vehicle while he checked on the bank. (*Id.*; *see also* Bohn Rpt. at 1.) An officer nearby, Kevin Bohn, saw the Vehicle, and began to follow it. (*See* Bohn Rpt. at 1.) Rock spoke with the bank tellers who told him that the male wearing

3

sunglasses had walked past the front entrance, but did not enter the bank. (*See* Rock Rpt. at 2.) The tellers had assumed he was walking to the ATM machine, which was outside and just past the front entrance of the bank. (*Id.*) Rock thought it was suspicious for the driver of the Vehicle to park so far away from the bank when using the ATM, when the parking lot of the bank was nearly empty. (*Id.*) At this point, Rock radioed the other officers to stop the Vehicle to investigate. (*Id.*)

      The Vehicle had pulled into a gas station and up to a pump, and Officer Bohn "effectuated a motor vehicle stop" of the Vehicle. (*See* Bohn Rpt. at 1.) As he approached the car, he observed that Banuelos was sitting in the driver's seat and that Angulo was in the gas station's convenience store. (*Id.*) Bohn asked Banuelos for her license and registration. (*Id.*) Banuelos handed Bohn her California driver's license and an insurance card, but stated that the Vehicle was a rental car and that she did not have the registration or the rental agreement. (*Id.*) Bohn noted that Banuelos only quickly glanced in the glove compartment before stating that she did not have the registration or rental agreement. (*Id.*) Bohn asked Banuelos who was in the vehicle with her; after a long pause followed by "ummmmmmmm," she looked around the car, and answered her boyfriend. (*Id.*) Bohn asked Banuelos if her boyfriend had gone into the

4

convenience store, and she responded that he had. (*Id.*; *see also* Dash Cam Video at 2:31.) The transcript of the video from the dash cam sets forth the conversation:

OFFICER BOHN: How are you doing Ma'am?
CRYSTAL BANUELOS: (UI)
OFFICER BOHN: You have your license and registration?
CRYSTAL BANUELOS: Um....
OFFICER BOHN: Is there someone else in the car with you?
CRYSTAL BANUELOS: I'm sorry?
OFFICER BOHN: Is there anybody else in the car with you?
CRYSTAL BANUELOS: (UI)
OFFICER BOHN: Huh?
CRYSTAL BANUELOS: Here's my license.
OFFICER BOHN: Okay
CRYSTAL BANUELOS: Actually I don't have um my registration. It's a rental car.
OFFICER BOHN: Okay. You have some rental documents. Who else is in the car with you?
CRYSTAL BANUELOS: This?
OFFICER BOHN: Yeah. That's fine. Who else is in the car with you?
CRYSTAL BANUELOS: I'm sorry?
OFFICER BOHN: Who else is in the car with you?
CRYSTAL BANUELOS: Um...(UI)
OFFICER BOHN: Ok....(UI) You had to think about that?
CRYSTAL BANUELOS: No.
OFFICER BOHN: What's going on?
CRYSTAL BANUELOS: Nothing, sir.

(Dash Cam Video Tr. at 1.)

Rock arrived on the scene and Bohn began to talk to him, but then saw Angulo exit the convenience store abruptly and quickly turn left to go to the south side of the building. (*Id.* at 2; *see also* Rock Rpt. at 2-3; Dash Cam Video at 3:02.) Bohn called to Angulo, who stopped to talk with him.

5

(Bohn Rpt. at 2.) The store clerk informed Bohn that when Angulo saw Bohn pull into the parking lot, Angulo "panicked, dropped all of his things and asked for the key to the bathroom." (Obuchowski Rpt. at 4.)

Angulo provided Bohn with a California driver's license. (Bohn Rpt. at 2.) Bohn and Rock asked Angulo why he was walking around the bank parking lot and Angulo said that his girlfriend saw a text message from another girl and they got into an argument. (*Id.; see also* Rock Rpt. at 3.) Bohn asked Angulo to stand by the hood of the Vehicle. (*Id.*)

At this point, Police Officer Michael Burns, Jr. and Sergeant William Obuchowski arrived on the scene. (*Id.*; Burns Rpt. at 1.) Rock reported that Banuelos and Angulo were giving conflicting and suspicious answers to their questions. (Burns Rpt. at 1.) Burns approached the Vehicle and asked Banuelos why they were in the area from California. (*Id.*) She said they were to attend her cousin's graduation, referred to as "her," but she could not answer what college her cousin attended and could not say what state the college was located in. (*Id.*) Burns reported that Banuelos "was very nervous and would take an unusual amount of time to answer questions." (*Id.*) She also stated that she did not know where she was staying. "She was very evasive with her answers and spoke in a very low voice. She would avoid eye contact while [the officers] spoke with her." (*Id.*)

6

Bohn proceeded to check on the validity of the licenses; he determined that both driver's licenses were valid and neither Banuelos nor Angulo had any outstanding warrants. (Bohn Rpt. at 2.) Bohn also determined that the Vehicle was registered to Rental Car Finance Company, but continued to call several rental companies to obtain verification that Banuelos properly possessed the Vehicle. (*Id.*) Obuchowski told Officer Bohn to contact the rental company and confirm that Banuelos was permitted to have possession of the Vehicle. (*See* Obuchowski Rpt. at 2.) Obuchowski also instructed Rock to remove the keys from the ignition, which he did. (*Id.* at 2.)

Obuchowski and Burns went to the front of the car to stand by Angulo. When questioned, Angulo referred to the cousin as a male and gave the name Nathan. (Burns Rpt. at 2.) "He had an aggravated demeanor." (*Id.*) While Angulo was sitting on the hood of the car, he kept turning around and attempting to talk to Banuelos. (*Id.*) He repeatedly put his hands to his pockets, even though he was instructed not to do so. (*Id.*) Every time the officers would go near the Vehicle, both Banuelos and Angulo appeared "to get nervous and annoyed" and "kept stating that [the police were] not allowed to search their vehicle." (Burns Rpt. at 2; *see also* Obuchowski Rpt. at 3.)

7

At this point, Burns suggested to Obuchowski that they ascertain whether a narcotics detection dog was available to walk around the vehicle. (Burns Rpt. at 2.) Obuchowski agreed, reportedly because "it was clear that both [Angulo and Banuelos] were lying and were attempting to hide something." (Obuchowski Rpt. at 3.) Obuchowski made the call and was advised that an officer with a K-9 would be responding to their location. (*Id.*)

Next, Rock opened the front passenger door of the Vehicle to search the glove box and center console for the rental agreement. (Rock Rpt. at 3; *see also* Burns Rpt. at 2; Obuchowski Rpt. at 3.) He reported that Banuelos became "extremely agitated" and demanded that Rock get out of the Vehicle. (Rock Rpt. at 3.) Similarly, Angulo became agitated and demanded that Rock stop going through "his stuff." (*Id.*)

Because Angulo was "visibly irritated," Obuchowski and Burns put him in the back of Bohn's police car, after searching him for weapons. (*Id.*; Burns Rpt. at 2.) Burns allowed Angulo to keep two cell phones and his wallet, but confiscated a clear plastic bag of pills that Angulo had represented were toothpicks. (Burns Rpt. at 2.) At Obuchowski's direction, Rock later took the two cell phones from Angulo and placed them on the

8

hood of the car, where they rang "continuously." (Obuchowski Rpt. at 3; Rock Rpt. at 4.)

At this point, Bohn was able to verify with Dollar Rent-A-Car that Banuelos had rented the Vehicle. (Bohn Rpt. at 2-3.) While Bohn was on the phone, Rock moved Angulo to the back of his police car. (*Id.* at 3.) During the entire encounter with Banuelos and Angulo, Bohn spent approximately 17 minutes initially speaking with Banuelos and Angulo, checking the driver's licenses of Angulo and Banuelos, running warrant checks, and attempting to figure out the phone number for the rental car company because Banuelos was not able to provide a copy of the rental agreement and claimed to not know any information about where she rented the car. (*See* Dash Cam Video at 1:35 – 18:45; Dash Cam Video Tr. at 1-7.) Bohn's call with the rental company lasted approximately 15 minutes to confirm that Banuelos was permitted to possess the rental car. (*See* Dash Cam Video at 18:45 – 32:38; Dash Cam Video Tr. at 7-9.)

Approximately ten minutes after Officer Bohn finished his call with the rental company, Corporal Ryan Bourbon of the Evesham Police Department arrived on the scene with his K-9 partner. (*See* Dash Cam Video Tr. at 41:57-43:13; Rock Rpt. at 4; Bohn Rpt. at 3; Burns Rpt. at 3.) The dog alerted to the scent of narcotics on the driver's side rear door, the

trunk and the passenger's side front and rear doors on the Vehicle, so the officers had it towed to the police station and obtained a warrant for its search. (*Id.*; Obuchowski Rpt. at 4-5.) The search yielded, among other things, approximately $13,000 in cash and counterfeit debit cards encoded with stolen bank account information with a corresponding pin number written on the card, and receipts for illegal cash withdrawals. (Johnson Rpt. at 3; Cinnaminson Police Evidence/Property Form at 1.)

## Discussion

The Fourth Amendment to the U.S. Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To prevail on a motion to suppress, a defendant generally bears the burden of proving that the challenged search or seizure was unreasonable under the Fourth Amendment. *See United States v. Acosta*, 965 F.2d 1248, 1257 n.9 (3d Cir. 1992) ("The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated."). However, once the defendant has established a basis for his motion, *i.e.*, that the search or seizure was conducted without a warrant, the burden shifts to the government to show that the search or seizure was reasonable. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

The police may stop a car and briefly detain it and its occupants in order to investigate a reasonable suspicion that such persons are involved in criminal activity if the stop is reasonably related in scope to the circumstances which justified the stop. *Terry v. Ohio,* 392 U.S. 1 (1968). Although the reasonable suspicion requirement is a "less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence," it nonetheless requires an officer to articulate an "objective justification for making the stop." *Illinois v. Wardlow,* 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow,* 490 U.S. 1, 7 (1989)). As such, "an officer who develops a reasonable, articulable suspicion of criminal activity may expand the scope of an inquiry beyond the reason for the stop and detain the vehicle and its occupants for further investigation." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003).

The Supreme Court has held that a dog sniff of a car *during* a lawful traffic stop does not violate the Fourth Amendment. *Illinois v. Caballes,* 543 U.S. 405, 410 (2005). *See also Indianapolis v. Edmond,* 531 U.S. 32, 40 (2000) (A dog sniff of the exterior of a car is "much less intrusive than a typical search") (quotation omitted). Further, the Court rejected the argument that, while executing the stop in a reasonable manner, the shift in purpose from a lawful traffic stop into a drug investigation was unlawful

because it was not supported by any reasonable suspicion. *Caballes,* 543 U.S. at 408. Rather, the Court upheld the trial judge's determination that a dog sniff was sufficiently reliable to establish probable cause to make a complete search of the trunk of the car. *Id.* at 409. The Third Circuit has acknowledged as much. "It is . . . well-established that, looking at the totality of the circumstances, a dog's positive alert while sniffing the exterior of the car provides an officer with the probable cause necessary to search [the interior of] the car without a warrant. *United States v. Pierce*, 622 F.3d 209, 213 (3d Cir. 2010) (citing *Karnes v. Skrutski,* 62 F.3d 485, 498 (3d Cir. 1995) ("[I]t is clear that the drug dog's alert would present probable cause for a search."); *United States v. Massac,* 867 F.2d 174, 176 (3d Cir. 1989) ("When the alert was given by the dog, we are satisfied that, at least when combined with the other known circumstances, probable cause existed to arrest.").

    However, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015)

(quoting *Caballes,* 543 U.S. at 407). Ordinary inquiries incident to a traffic stop include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's *registration* and proof of insurance." *Id.* at 1615 (emphasis added). Reasonable suspicion of criminal activity may justify detaining an individual beyond completion of the traffic infraction investigation for a dog sniff. *Id.* Where the officer had reasonable suspicion of criminal activity, the Third Circuit upheld expanding an initial traffic stop to effect a K-9 search held ten minutes after the defendant would have been free to leave the traffic stop; the entire stop took 55 minutes. *United States v. Robinson,* 529 F. App'x 134 (3d Cir. 2013). *See also United States v. Leal*, 235 F. App'x 937 (3d Cir. 2007) (upholding K-9 search delayed by 80 minutes); *United States v. Frost*, 999 F.2d 737, 740-42 (3d Cir. 1993) (same).

    Angulo has argued that the evidence recovered from the rental car should be suppressed because the officers' reasonable suspicion of a bank robbery had dissipated by the time of the traffic stop (when Rock confirmed there had been no bank robbery) and the police lacked any fresh suspicion to extend the traffic stop to include a K-9 search.

13

The Court finds that the officers in this case had a reasonable and articulable suspicion of illegal activity sufficient to extend the stop. Although the bank tellers reported that Angulo had not entered the bank, Rock's suspicion was increased because the driver of the Vehicle parked far away from the bank's ATM, even though the parking lot of the bank was nearly empty. Suspects in recent bank robberies parked in the same location as the Vehicle. Rock also noted that Angulo was wearing dark sunglasses on a cloudy day and both he and Banuelos avoided eye contact with the officer. The fact that the Vehicle was a rental car with out-of-State tags is also why Rock had another officer stop the Vehicle to question the occupants.

Officer Bohn approached Banuelos in the Vehicle, and she produced a California driver's license but no vehicle registration or rental agreement. She also seemed evasive in her answers to questions. Next, Angulo exited the convenience store and walked quickly away from the Vehicle, rather than toward it. Information from the store clerk led to a suspicion that Angulo was attempting to take flight and possibly hiding narcotics. Both Banuelos and Angulo appeared nervous, and gave inconsistent stories about their travel.

This demeanor continued after Obuchowski and Burns arrived on the scene. Banuelos and Angulo both became irritated with the officers when they got close to the vehicle. At Burns' suggestion, Obuchowski made the call to check on the availability of a K-9 *before* Bohn was able to ascertain that Banuelos properly possessed the Vehicle. The K-9 arrived on scene approximately ten minutes after Bohn finished his call with the rental company. There is no evidence that the officers artificially prolonged the stop to wait for a K-9 unit.

Considering the totality of the circumstances, the officers possessed reasonable suspicion that a crime was being committed. The fact that the suspicion shifted from suspicion of criminal activity regarding the bank to suspicion of narcotics activity did not make the search unlawful.

## Conclusion

In keeping with the above, the motion to suppress evidence will be denied. An Order will accompany this Opinion.


Dated: February 22, 2017            /s/ Joseph H. Rodriguez
                                        Joseph H. Rodriguez
                                        U.S.D.J.